**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Maria TONEY, Defendant–Appellant.**

No. 97–1138.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 30, 1998.

Decided Dec. 2, 1998.

Stephen L. Hiyama, Asst. U.S. Attorney (argued and briefed), Office of U.S. Attorney, Detroit, MI, for Plaintiff–Appellee.

Susan K. Rock (argued and briefed), Dearborn Heights, MI, for Defendant–Appellant.

Before: NELSON, CLAY, and GILMAN, Circuit Judges.

GILMAN, Circuit Judge.

Maria Toney was one of four individuals prosecuted in connection with a scheme to defraud Blue Cross Blue Shield of Michigan ("Blue Cross") by cashing falsified benefit payment checks. A jury convicted Toney on 35 counts of mail fraud pursuant to 18 U.S.C. § 1341, and the district court sentenced her to 21 months in prison. Although Toney does not appeal her sentence, she appeals her conviction based on alleged evidentiary errors committed by both the government and the district court. For the reasons set forth below, we **AFFIRM** Toney's conviction.

## I. BACKGROUND

### A. Factual Background

Toney's long-time friend and neighbor, Kristen Armstrong, worked for Blue Cross in the Master Medical Department in Southfield, Michigan. Armstrong handled questions from Blue Cross subscribers about their claims and benefit payments. Through her position, Armstrong fraudulently caused Blue Cross to generate 48 checks that she had mailed either to her own home or to the houses of Toney, Yvette Petty, and Bridget

Reardon. Armstrong entered, or caused an unwitting clerk to enter, fraudulent information into the Blue Cross computer system from her home office in Southfield. The information was then transmitted electronically to Blue Cross's headquarters in downtown Detroit, where computer-generated checks were printed automatically, stuffed into envelopes, and delivered to a U.S. Postal Service facility for mailing to the payees.

The first unauthorized check was dated July 20, 1994, and the last was dated February 20, 1995. Armstrong caused 31 of the 48 fraudulent Blue Cross checks to be made payable to Toney and mailed to Toney's house. Four other checks, payable to Deborah Baker (another of Armstrong's neighbors), were mailed to Toney's house. The remaining 13 checks were mailed to the houses of Armstrong, Petty, and Reardon. As part of her fraudulent scheme, Armstrong caused the checks to be issued through several legitimate Blue Cross health insurance accounts without the consent or knowledge of the subscribers.

Toney's father was diagnosed with lung cancer in October of 1991 and died in June of 1992. His insurance carrier was Blue Care Network of Southeast Michigan, an HMO subsidiary of Blue Cross. Blue Care Network paid all of the medical expenses arising from his terminal illness. Toney testified that she received a bill long after her father had died and, because she believed the bill to be a mistake, she approached her neighbor and friend, Armstrong, for advice on how to proceed. According to Toney, Armstrong then suggested that Toney might be eligible for money from Blue Cross for the full-time care she had provided her father. The first Blue Cross check issued to Toney, allegedly for the care she provided to her father, was dated August 3, 1994. Toney never submitted any claim forms or provided Armstrong with any supporting details as a backup for the checks she received.

Toney endorsed and cashed 27 of the 31 checks payable to herself. She cashed six of the checks at the Viceroy Market and the other 21 checks at various branches of Michigan National Bank, the bank on which the checks were drawn. The Viceroy Market charged Toney between 1½ and 4% of the face amount to cash the checks. None of the checks was deposited in Toney's own checking account.

The fraudulent scheme began to unravel on February 22, 1995, when Toney encountered difficulties negotiating one of the checks. On February 23, 1995, Southfield Police Department officers arrested Armstrong for a probation violation connected to an unrelated felony conviction in Washtenaw County. On that same date, Special Agents Jerry Craig and James Hoppe of the Federal Bureau of Investigation obtained a waiver of Armstrong's *Miranda* rights and proceeded to interview her about the Blue Cross checks.

Also on February 23, 1995, the Michigan National Bank's security personnel and Detroit police officers briefly detained Toney while she was attempting to negotiate one of the checks. They informed her that the check was fraudulent and that the FBI wanted to speak with her about it. Toney was given the name and telephone number of an FBI agent to call, this agent being one of the two who had interviewed Armstrong earlier that day. Just before Toney phoned the FBI agent, she received a telephone call from Armstrong in jail. After speaking with Armstrong, Toney phoned the FBI agent and set up an appointment for the following morning. At that time, Toney denied any wrongdoing.

Because of the scheme's collapse, Toney was unable to cash the last four of the 31 checks payable to her. The 27 Blue Cross checks that Toney did cash totaled $77,257.76; the four that she did not negotiate were in the cumulative amount of $37,493.00. Altogether, Armstrong's fraudulent scheme resulted in the issuance of 48 Blue Cross checks totaling $149,262.61, of which 44 checks in the amount of $111,769.61 were cashed. Petty, Reardon, and Armstrong negotiated the remaining 17 checks, with Petty and Reardon splitting the proceeds with Armstrong.

**B. Procedural Background**

On June 8, 1995, the government issued a criminal complaint charging Toney, Armstrong, Petty, and Reardon with mail fraud

under 18 U.S.C. § 1341. On October 5, 1995, Petty pled guilty pursuant to a plea agreement. The next day, Reardon entered into a twelve month pretrial diversion agreement with the government.

On February 8, 1996, a federal grand jury in Detroit returned an indictment charging Toney and Armstrong with mail fraud. On the first day of trial, October 3, 1996, Armstrong pled guilty to all 38 counts against her without the benefit of a plea agreement. Toney's trial began the following day. Twelve days later, the jury found Toney guilty on all 35 counts against her. On January 21, 1997, the court sentenced Toney to 21 months' imprisonment and two years' supervised release. The court also ordered Toney to pay restitution to Blue Cross in the amount of $79,233.76 and imposed mandatory special assessments totaling $1,750.00. On January 24, 1997, Toney filed a timely notice of appeal challenging her conviction.

## II. ANALYSIS

### A. Prior Consistent Statements

#### 1. The statements

During Toney's trial, Armstrong testified on Toney's behalf. Specifically, Armstrong admitted her own guilt in the scheme to defraud Blue Cross and denied any knowledge or involvement on the part of Toney. Armstrong corroborated Toney's own testimony that, based on Armstrong's representations, Toney believed that she had legitimately received the Blue Cross checks as reimbursement for the full-time care she provided to her father while he was dying of lung cancer. Armstrong also testified that Toney never gave Armstrong any portion of the check proceeds.

The government cross-examined Armstrong regarding inconsistent oral statements that she allegedly had made to the two FBI agents at the time of her arrest. Armstrong was asked to admit that she had told the agents that Toney, Petty, and Reardon knew the Blue Cross checks were fraudulent, and that they had split the proceeds with her. Armstrong denied making any such inconsistent statements. The government never presented any proof that she had.

On redirect examination, Toney's counsel unsuccessfully attempted to introduce two written statements that Armstrong had made prior to the trial that fully exculpated Toney and were consistent with Armstrong's trial testimony. One was a letter dated August 11, 1995, and the other was a virtually identical affidavit dated September 9, 1995 (collectively the "affidavit"). In the affidavit, Armstrong declared that Toney had no involvement in or knowledge of the fraudulent scheme. Armstrong explained in the affidavit that she had led Toney to believe that all of the Blue Cross checks that Toney received were legitimate payments pursuant to her father's insurance benefits for the full-time care that Toney had provided during her father's terminal illness. Additionally, Armstrong stated in the affidavit that Toney never gave Armstrong any of the proceeds from the checks.

Armstrong had also made an oral statement to the district court on October 3, 1996, when she pled guilty the day before Toney's trial began. During her change of plea, Armstrong admitted her own guilt, and also offered numerous statements that fully exculpated Toney. The government objected to the introduction of any of Armstrong's prior consistent statements. The district court sustained the objection, finding that Armstrong had made the statements after a motive to lie had arisen.

On appeal, Toney contends that the district court's exclusion of Armstrong's prior consistent statements constitutes reversible error. Toney argues that the district court should have admitted the statements as substantive evidence under Rule 801(d)(1)(B) of the Federal Rules of Evidence, or if not, then at least admitted them for the limited purpose of rehabilitation.

#### 2. Statements under Rule 801(d)(1)(B)

##### a. Standard of review

"A district court's determination of whether evidence constitutes hearsay under the Federal Rules of Evidence is a conclusion of law that is reviewed de novo." *Cox v. Treadway*, 75 F.3d 230, 238 (6th Cir.1996) (citing *Hancock v. Dodson*, 958 F.2d 1367,

1371 (6th Cir.1992)). Rule 801(d)(1)(B) provides as follows:

> A statement is not hearsay if ... [t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the [prior] statement, and the statement is ... consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive....

In order to secure admissibility under Rule 801(d)(1)(B), the declarant must have made the prior consistent statements before the motive to fabricate or improper influence or motive arose. *See Cox,* 75 F.3d at 238–39 (applying *Tome v. United States,* 513 U.S. 150, 167, 115 S.Ct. 696, 130 L.Ed.2d 574 (1995), which held that Rule 801(d)(1)(B) "permits the introduction of a declarant's consistent out-of-court statements to rebut a charge of recent fabrication or improper influence or motive only when those statements were made before the charged recent fabrication or improper influence or motive.").

■ The district court found that Armstrong had made the prior out-of-court statements after a motive to lie had arisen, and thus excluded the statements as hearsay under Rule 802 of the Federal Rules of Evidence. The district court's determination of when the motive to lie arose is a factual finding, which we review under the "clearly erroneous" standard. *See United States v. Piva,* 870 F.2d 753, 758–59 (1st Cir.1989) (finding that the district court's admission of a government informant's prior consistent statements, offered under Rule 801(d)(1)(B) to rebut a charge of recent fabrication or improper influence, was not clearly erroneous); *see also United States v. Gessa,* 971 F.2d 1257, 1261 (6th Cir.1992) (en banc) (applying the clearly erroneous standard for factual determinations regarding coconspirator statements under Rule 801(d)(2)(E)). A factual finding is clearly erroneous when, although there is evidence to support that finding, "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gyp-*

*sum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948).

### b. The district court's exclusion of the statements was not clearly erroneous

■ During the trial, the government objected to Toney's attempt to introduce Armstrong's prior consistent statements. Specifically, the government argued that the statements constituted inadmissible hearsay. Toney's attorney countered that the government had opened the door on cross-examination when it attempted to impeach Armstrong with her alleged statements made during the FBI interview, and that the prior consistent statements constituted non-hearsay under Rule 801(d)(1)(B). In response, the government submitted that *Tome v. United States,* 513 U.S. 150, 115 S.Ct. 696, 130 L.Ed.2d 574 (1995), governs the admission of prior consistent statements under Rule 801(d)(1)(B), and that it requires, in this case, that Armstrong have made the prior consistent statements before a motive to lie arose. The government contends that Armstrong developed the motive to lie to in order to protect Toney when the scheme began to unravel on February 22–23, 1995, and that her motive to lie solidified when the government filed the criminal complaint, all of which occurred before Armstrong made the statements exculpating Toney. Specifically, the government argued:

> [A]s far as motive to lie goes, I think it arose ... when the scheme came crashing down, when they were found out, and it was reinforced when all four were charged criminally in a complaint that was filed on June 8th of '95. Maria Toney appeared on that complaint on June 12, 1995. And I think Kristen Armstrong just wants to protect her friend. She might feel guilty about having drawn her into this.

The district court concluded:

> [T]he Supreme Court case does indicate that the prior consistent statement must have been made before the motive to fabricate arose. Now, truthfully, I cannot really identify what the motive is here. [Armstrong pled] guilty. She's facing a lot of time. But, you know, she may have some

reason for protecting Maria Toney that's not apparent to me and have decided it early on. And I don't think it's up to me to speculate what the motive might be. The fact is that she made a statement that she now disclaims when she first was arrested. This is an inconsistent statement that came six months later, after she has had a chance to discuss this. So I think it's hearsay.... I don't know what the motive might be here. But certainly the Government's position is that she changed her position between the time of her initial contact with the FBI and the time the criminal complaint was filed. And it remains an out-of-court statement offered for the truth of it unless it is offered before the improper motive arose. And that is crystal clear from the *Tome* case.

Although the district court expressed uncertainty about the nature of Armstrong's motives, it ultimately adopted the logic of the government that Armstrong initially made a statement inculpating Toney when first confronted by the FBI, but then changed her story after she had time to reflect and after the government filed the criminal complaint against them both. The district court thus concluded that the motive to lie arose before Armstrong made the prior consistent statements. In the final analysis, the district court's finding is not clearly erroneous because, after reviewing the entire record, we are not left with the definite and firm conviction that a mistake has been committed.

Given the finding that Armstrong made the statements after the motive to lie arose, the statements cannot gain admission as non-hearsay under Rule 801(d)(1)(B). Thus the district court properly excluded the statements as hearsay under Rule 802.

*3. Statements as rehabilitative evidence*

*a. Standard of review*

■ The district court's refusal to admit Armstrong's prior consistent statements as rehabilitative evidence was an evidentiary ruling. "A trial court's decision to exclude evidence is reviewed for abuse of discretion." *Sutkiewicz v. Monroe County Sheriff,* 110 F.3d 352, 357 (6th Cir.1997). The reviewing court must not disturb the discretion of the trial court "unless the reviewing court finds that the ruling excluding the evidence is not only erroneous but results in substantial injustice to the aggrieved party." *Id.*

*b. The district court did not abuse its discretion by excluding the statements*

■ Prior consistent statements may not be admitted as substantive evidence unless they comport with Rule 801(d)(1)(B) of the Federal Rules of Evidence. *See Engebretsen v. Fairchild Aircraft Corp.,* 21 F.3d 721, 730 (6th Cir.1994). As discussed above, Armstrong's statements did not qualify for Rule 801(d)(1)(B) non-hearsay status. Statements that fail to fit within Rule 801(d)(1)(B), however, may still be admissible for the limited purpose of rehabilitating an impeached witness if the statements clarify or explain the prior inconsistent statements with which the cross-examiner has impeached that witness. *See Engebretsen,* 21 F.3d at 729–30 (ruling that impeachment of a witness with the witness's lengthy report entitled defendant to introduce other statements in the report that were prior consistent statements in order to rehabilitate the witness "by clarifying or explaining his prior statements").

■ Armstrong's prior consistent statements in no way clarify or explain the even earlier inconsistent statements that she allegedly made to the FBI. She made the prior consistent statements after she made the alleged inconsistent statements to the FBI agents and after her motive to lie arose. Such testimony, therefore, would only have bolstered Armstrong's in-court exculpatory statements, not clarified or explained her prior inconsistent statements.

For the above reasons, the prior consistent statements had no rehabilitative value, and thus were inadmissible as irrelevant evidence under Rule 402 of the Federal Rules of Evidence. *See Engebretsen,* 21 F.3d at 730 (finding that statements favoring defendant's case but that did not rehabilitate the impeached witness were inadmissible even for a limited purpose).

## B. Prior Inconsistent Statements

### 1. The government's references in its closing argument to inconsistent statements that were not in evidence and the district court's related jury instruction

The government attempted to impeach Armstrong with statements that she allegedly made during an FBI interview on February 23, 1995. According to the FBI's memorandum of the interview, which the government never introduced as evidence, Armstrong ultimately

> admitted that she had engaged in a scheme with Maria Toney, Yvette Petty, and Bridget Reardon to fraudulently obtain funds from Blue Cross ... [and she] advised that Reardon, Yvette Petty and Maria Toney all knew that they were not entitled to the money from Blue Cross. ...

Additionally, the memorandum states that Armstrong advised that both Toney and Petty had split proceeds from the fraudulent Blue Cross checks with her.

During the cross-examination of Armstrong at Toney's trial, the government asked Armstrong whether she had told the FBI during the February 23 interview that Toney knew the Blue Cross checks were fraudulent and that Toney had split the proceeds with her. In response, Armstrong denied that she ever made those statements to the FBI. One of the FBI agents who interviewed Armstrong testified at trial, but the government did not question him about the interview, nor did the government offer any extrinsic proof of the alleged inconsistent statements that Armstrong purportedly made at that time.

In its closing argument, the government made three references to Armstrong's alleged inconsistent statements to the FBI. Toney's counsel objected to the first two references. In addition, during the defense's closing argument, counsel emphasized that the government had presented no evidence that Armstrong had ever made any inconsistent statements to the FBI. The government did not refer to the alleged statements in its rebuttal. During the final instructions to the jury, the district court stated, in direct reference to Armstrong and one other witness, that a witness's prior inconsistent statements could be used only for impeachment purposes and not as substantive evidence.

■ The government acknowledges that there was no evidence before the jury that Armstrong had made the inconsistent statements, and accordingly, admits that its closing argument remarks were improper. We agree. *See, e.g., United States v. Solivan,* 937 F.2d 1146, 1151 (6th Cir.1991) ("[T]he government prosecutor may not ... bring to the jury's attention purported facts that are not in evidence ...."). The district court's reference to Armstrong when giving the jury instruction regarding the evaluation of inconsistent statements was similarly improper. *See, e.g., United States v. James,* 819 F.2d 674, 675 (6th Cir.1987) ("It is of course well established that an instruction should not be given if it lacks evidentiary support or is based upon mere suspicion or speculation.") (citations and quotation marks omitted).

### 2. The harmless error standard

■ Given that both the government and the district court committed error regarding their references to Armstrong's alleged prior inconsistent statements, we must determine whether those errors were harmless. Rule 52(a) of the Federal Rules of Criminal Procedure sets forth the harmless error rule as follows: "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." This court has stated that "[w]here an error is not of constitutional dimension, it is harmless unless it is more probable than not that the error materially affected the verdict." *United States v. Martin,* 897 F.2d 1368, 1372 (6th Cir.1990). In determining whether an error affects a substantial right that requires the reversal of a conviction, we must review the entire record. *See United States v. Lane,* 474 U.S. 438, 448 n. 11, 450, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986) (stating that Rule 52(a) required a review of the whole record when the defendant claimed that misjoinder of a mail fraud count warranted reversal).

### 3. The government's improper references constituted harmless error

In order to determine when a prosecutor's improper remarks constitute reversible error, this court has articulated the following analysis:

First, the court is to apply the so-called *Leon* factors to determine whether the impropriety was flagrant. [*See United States v. Leon*, 534 F.2d 667 (6th Cir. 1976)]. Flagrant improprieties constitute reversible error. Non-flagrant improprieties are subjected to the *Bess* test which requires a new trial if proof of guilt was not overwhelming, defendant objected to the improper remarks, and the court failed to cure the error with an admonishment to the jury. [*See United States v. Bess*, 593 F.2d 749 (6th Cir.1979)]. The *Leon* factors are as follows: (1) The degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; (2) whether the comments were isolated or excessive; (3) whether they were deliberately or accidentally placed before the jury; (4) and finally, the strength of the competent proofs introduced to establish the guilt of the accused.

*United States v. Wiedyk*, 71 F.3d 602, 608 (6th Cir.1995) (internal citations omitted).

Examining the government's remarks in light of the *Leon* factors, the first three factors weigh in favor of Toney, while the final factor weighs in favor of the government. First, the remarks had a tendency to mislead the jury and prejudice the accused because the remarks could have led the jury to believe that the government proved the existence of the prior inconsistent statements. This could have caused the jury to discredit Armstrong's exculpatory statements at trial, which were key to Toney's defense. Second and third, given that the government made a total of three references to the alleged inconsistent statements during its closing argument despite two objections by Toney's counsel, the remarks could be viewed as excessive and deliberate. The government, however, prevails on the fourth factor because of the strength of the competent proof that it presented at trial establish-

ing Toney's guilt. *See infra.* After carefully reviewing the record as a whole, we do not find the government's improprieties to be flagrant in this case.

We next examine the government's remarks in light of the *Bess* factors, under which the improprieties "require[ ] a new trial if proof of guilt was not overwhelming, defendant objected to the improper remarks, and the court failed to cure the error with an admonishment to the jury." *Wiedyk*, 71 F.3d at 608. Toney's counsel objected to the government's remarks, and emphasized in her closing argument that the government failed to offer any proof of the alleged statements. Additionally, the district court did not properly cure the error. Although the district court gave general instructions that put the jury on notice that the lawyers' statements were not evidence and that the jury could disregard the lawyers' inferences, the district court itself inappropriately implied that Armstrong had made the prior inconsistent statements to the FBI agents. On the other hand, we find that the government provided overwhelming evidence of Toney's guilt. The following is a summary of the government's proof against her:

- 31 of the 48 fraudulent Blue Cross checks were mailed to Toney and were payable to her
- 4 other checks payable to Baker were also mailed to Toney's home, with Armstrong ultimately receiving and cashing them
- Toney endorsed and cashed 27 of the 31 checks
- Toney cashed the checks at either the Viceroy Market, where she incurred a fee, or at various branches of Michigan National Bank, rather than depositing them in her own checking account
- The 27 checks Toney cashed totaled $77,257.76, and the four she failed to negotiate totaled $37,493.00, the combination being a very large sum of money for undocumented care she provided her father over an eight month period of time (to say nothing of the improbability that her father's insurance would even cover such care)

- Petty and Reardon knew the scheme was fraudulent and split the proceeds with Armstrong
- During the time frame of the scheme, a number of large cash deposits were made into Armstrong's account for which there was no apparent source other than the Blue Cross checks payable to Toney
- Armstrong's excuses for the large cash deposits were not credible, e.g., that drug dealers paid her for letting them use her driveway to sell drugs
- Blue Cross systematically and electronically included vouchers (describing the subscriber and the provider) with its checks, which contradicts Toney's testimony that no vouchers were attached to any of her checks
- Toney admitted never having completed any paperwork for the alleged reimbursement and never having provided Armstrong with any details regarding the nature of the care she provided, e.g., the daily hours spent caring for her father or the travel distances to the hospital

In sum, the government appears to have presented overwhelming evidence of Toney's guilt. Its improper references to Armstrong's alleged inconsistent statements to the FBI should therefore be treated as harmless error because it is more probable than not that these improper references did not materially affect the verdict.

### 4. The district court's inappropriate jury instruction constituted harmless error

The district court instructed the jury as follows:

> You have heard the testimony of Kristen Armstrong and Bill Bahoora. You have also heard that before this trial they made statements that may be different from their testimony here in court. The earlier statements were brought to your attention only to help you decide how believable their testimony was. You cannot use it as proof of anything else. You can only use it as one way of evaluating their testimony in court.

The court's instruction was based on Sixth Circuit Pattern Criminal Jury Instruction 7.04. Toney's counsel objected to the instruction twice, and raised the issue again in a motion for a new trial. The district court rejected defense counsel's argument that the instruction should have made no reference to Armstrong because of the government's failure to prove that she ever made the inconsistent statements.

The government concedes that the district court's reference to Armstrong was inappropriate, but contends that it was harmless because the instruction was permissive rather than mandatory. The district court's instruction does strongly suggest that Armstrong actually made the prior statements to the FBI agents, and was therefore erroneous.

We find it more probable than not, however, that the district court's improper reference did not materially affect the verdict. The instruction included permissive rather than mandatory language regarding the conclusion the jury could draw from the evidence, and the district court provided other instructions regarding the jury's power to reject attorneys' inferences. Additionally, the jury could have discredited Armstrong on one of the other impeachment grounds that the government did prove, such as a specific instance of Armstrong lying in the past, and Armstrong's two prior convictions (embezzlement and her guilty plea to the Blue Cross mail fraud conviction). The jury may also have simply relied on the competent proof that the government provided establishing Toney's guilt. We further note that Toney's counsel clearly reminded the jury during closing argument that there was no evidence of any such inconsistent statements by Armstrong.

Perhaps most importantly, the jury had the ability to recall the absence of proof on that point and reject the instruction. *See Buhrmaster v. Overnite Transp. Co.,* 61 F.3d 461, 463–64 (6th Cir.1995) ("In [*United States v. Mari,* 47 F.3d 782 (6th Cir.1995) ], we held that when a jury charge accurately states the law but is not supported by the facts, any error in giving the instruction is harmless as a matter of law. The jury will conclude for

itself that there is insufficient evidence to support an application of the instruction, and thus reject it as 'mere surplusage.' "). In sum, although the reference was improper, the error was harmless.

## C. Similar Acts of Third Parties

### 1. The district court's admission of similar acts evidence

The district court allowed the government to present evidence regarding Petty and Reardon's participation in the scheme, including the manner in which they handled the Blue Cross checks mailed to their homes and split the proceeds with Armstrong. Both Petty and Reardon testified at trial. Toney objected on the basis that the testimony was inadmissible.

### 2. Standard of review

"The standard of review for the admission of evidence where relevance is at issue is abuse of discretion, which exists when the reviewing court is firmly convinced that a mistake has been made." *Morales v. American Honda Motor Co.*, 151 F.3d 500, 516 (6th Cir.1998) (citing *United States v. Wiedyk*, 71 F.3d 602, 609 (6th Cir.1995)). The reviewing court must not disturb the discretion of the trial court "unless the reviewing court finds that the ruling excluding evidence is not only erroneous but results in substantial injustice to the aggrieved party." *Sutkiewicz v. Monroe County Sheriff*, 110 F.3d 352, 357 (6th Cir.1997).

### 3. The district court did not abuse its discretion in admitting the similar acts of others involved in the same criminal enterprise

■ The government introduced the testimony of Petty and Reardon to show that they split their proceeds with Armstrong, which provided relevant evidence about the sources of the cash deposits into Armstrong's bank account. By eliminating the known cash deposits into Armstrong's account, the government provided the jury with evidence to infer that a number of the cash deposits into Armstrong's account could only be explained as Armstrong's portion of the Blue Cross checks issued to Toney. Additionally, the government contends that the testimony was relevant towards discrediting Toney's position that she and Armstrong had an altruistic arrangement, given that both Petty and Reardon knew that their arrangement with Armstrong was fraudulent. The district court properly instructed the jury that Armstrong and Petty's guilty pleas and Reardon's placement on pretrial diversion could not be used as evidence of Toney's guilt.

Based on the above, the district court did not abuse its discretion in concluding that Petty and Reardon's testimony was relevant under Rule 401 of the Federal Rules of Evidence. Nor did the district court abuse its discretion in finding that the testimony's probative value was not substantially outweighed by unfair prejudice under Rule 403 of the Federal Rules of Evidence.

■ Toney also contends that the district court should have excluded Petty and Reardon's testimony under Rule 404(b) of the Federal Rules of Evidence, which governs evidence of other crimes, wrongs, or acts. She cites *United States v. Lightle*, 728 F.2d 468, 470 (10th Cir.1984), for the proposition that the "acts of misconduct performed by one person cannot be used to imply the guilt of another who is not shown in any way to be involved in the misconduct of that other person." Rule 404(b), however, does not apply to acts that are intrinsic to a continuing pattern of criminal activity. *See United States v. Barnes*, 49 F.3d 1144, 1149 (6th Cir.1995) ("When the other crimes or wrongs occurred at different times and under different circumstances from the offense charged, the deeds are termed 'extrinsic.' 'Intrinsic' acts, on the other hand, are those that are part of a single criminal episode. Rule 404(b) is not implicated when the other crimes or wrongs evidence is part of a continuing pattern of illegal activity.").

In the instant matter, the first criminal complaint charged Petty, Reardon, Armstrong, and Toney with involvement in a single continuous scheme to defraud Blue Cross. Prior bad acts and communications of third persons who are participants in a multi-party mail fraud scheme are admissible as long as they constitute part of the same

criminal episode, whether or not a conspiracy is charged, and as long as independent evidence ties the defendant to that scheme. *See United States v. Krohn*, 573 F.2d 1382, 1386–87 (10th Cir.1978) (finding that the district court properly admitted prior bad acts of participants in a mail fraud scheme against other particular defendants because independent evidence connected the particular defendants to the scheme). The government presented ample proof regarding the existence of a scheme to defraud Blue Cross and also of Toney's participation in the scheme. Rule 404(b), therefore, does not bar the admissibility of Petty and Reardon's testimony, and the district court did not abuse its discretion in admitting their testimony for its probative value.

## III. CONCLUSION

For all of the reasons stated above, we **AFFIRM** Toney's conviction as set forth in the judgment of the district court.