**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                          No. 96-4189

LEROY ELLIS,
Defendant-Appellant.

Appeal from the United States District Court
for the Western District of Virginia, at Danville.
Jackson L. Kiser, Senior District Judge.
(CR-94-36-D)

Argued: May 9, 1997

Decided: August 6, 1997

Before HAMILTON and MOTZ, Circuit Judges, and
CURRIE, United States District Judge for the
District of South Carolina, sitting by designation.

_____

Affirmed by published opinion. Judge Currie wrote the opinion, in
which Judge Hamilton and Judge Motz joined.

_____

**COUNSEL**

**ARGUED:** Paul Graham Beers, GLENN, FELDMAN, DARBY &
GOODLATTE, Roanoke, Virginia, for Appellant. Thomas Ernest
Booth, UNITED STATES DEPARTMENT OF JUSTICE, Washing-
ton, D.C., for Appellee. **ON BRIEF:** Robert P. Crouch, Jr., United
States Attorney, Anthony P. Giorno, Assistant United States Attorney,

UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

_____

**OPINION**

CURRIE, District Judge:

Leroy Ellis appeals his convictions for conspiracy, see 18 U.S.C. § 371, and for the lesser included offense of unarmed bank robbery, see 18 U.S.C. § 2113(a) & (d). We affirm.

I.

On the morning of September 25, 1993, two masked men robbed the First National Bank of Ferrum in Oak Level, Virginia. Robber #1 (alleged to be appellant) entered the bank, jumped over the counter, and stuffed money from three teller drawers into a black duffle bag. Thereafter, he forced bank employee Lola Green to open the bank vault from which additional money was taken. Robber #2, Anthony Wagner, entered the bank lobby shortly after Robber #1 and pointed a gun at the tellers. Detectives arriving at the crime scene later that morning took statements from the employees. According to one of the tellers, Patricia Grindstaff, Robber #1 was about six feet tall and considerably taller than Robber #2. According to Lola Green, Robber #1 was about five feet six inches tall.

On April 22, 1994, a grand jury indicted appellant on three counts of a five count indictment. Count I charged appellant with conspiracy to commit bank robbery under 18 U.S.C. § 371. Count II charged appellant and others "as principles or aiders and abettors" with bank robbery under 18 U.S.C. § 2113(a) & (d). Count III charged appellant with use of a firearm in the commission of a crime of violence under 18 U.S.C. § 924(c).

Appellant's first trial on these charges (hereinafter Trial #1) began on December 28, 1994. In addition to the testimony of bank employees present at the time of the robbery, the government presented testimony of three other women, Sharon Wagner, Rita Ellis and Dorla

2

Enriquez, who had assisted in the crime and who each testified to appellant's participation in planning and carrying out the robbery. On January 4, 1994, a jury found appellant guilty on Count I of the indictment, but deadlocked as to Counts II and III. **1**

On May 30, 1995, the government retried appellant on Counts II and III (hereinafter Trial #2). This time, in addition to the testimony of Sharon Wagner, Rita Ellis and Dorla Enriquez, the government called appellant's co-defendant from Trial #1, Rodney Van Wright, who identified appellant as one of the two robbers pictured in the bank's surveillance photograph. On June 1, 1995, the jury returned a verdict of guilty under Count II for the lesser included offense of unarmed bank robbery, but acquitted appellant of the firearm charge under Count III.

II.

Appellant cites four errors he contends require reversal of his conspiracy conviction in Trial #1: (1) the failure of the government to state a criminal offense under 18 U.S.C. § 371; (2) the suppression of Sharon Wagner's October 1993 FBI 302 in violation of Brady v. Maryland, 373 U.S. 83 (1963); (3) the admission into evidence of Sharon Wagner's February 1994 FBI 302, and; (4) a lack of sufficient evidence supporting appellant's conspiracy conviction. We examine each of these arguments in turn.

A.

Initially, we turn to appellant's claim that the district court lacked jurisdiction to convict him of conspiracy to commit armed bank robbery under 18 U.S.C. § 371.**2** For support, appellant relies on the

_____

**1** At Trial #1, the jury also returned a guilty verdict against appellant's co-defendant, Rodney Van Wright, who had been charged under Count IV of the indictment with being an accessory after the fact to the bank robbery.

**2** In pertinent part, 18 U.S.C.§ 371 reads:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years or both.

3

Supreme Court's decision in Tanner v. United States, 483 U.S. 107 (1987), which held that establishing a conspiracy to "defraud the United States" under the second clause of § 371 required the government to prove that the United States or one of its agencies was the target of the fraud. Id. at 128-32. Appellant asks us to extend this same victim-specific restriction on the scope of the statute to the case at bar and to conclude that conspiring to rob a private bank does not constitute an offense under the statute. Like other issues of statutory construction, we review this claim de novo. United States v. Childress, 104 F.3d 47, 49 (4th Cir. 1996).

18 U.S.C. § 371 criminalizes two types of conspiracies: conspiracies to commit an offense against the Unites States and conspiracies to defraud the United States. United States v. Arch Trading Company, 987 F.2d 1087, 1090 (4th Cir. 1993).

We reject appellant's invitation and conclude, consistent with other circuits, that a conspiracy to commit "any offense against the United States" under the first clause of § 371 extends generally to cover any offense made illegal by federal law. See United States v. Brandon, 17 F.3d 409, 422 (1st Cir. 1994); United States v. Harmas, 974 F.2d 1262, 1266 (11th Cir. 1992); United States v. Loney, 959 F.2d 1332, 1338-39 (5th Cir. 1992); United States v. Gibson , 881 F.2d 318, 321 (6th Cir. 1989). Indeed, our explicit recognition of this distinction between the victim-specific "defraud the United States" prong and the "offense against the United States" prong merely highlights a difference that we have implicitly acknowledged since Tanner. See, e.g., United States v. Roseboro, 87 F.3d 642 (4th Cir.), cert. denied, 117 S.Ct. 694 (1997); United States v. Williams, 10 F.3d 1070 (4th Cir. 1993) (affirming convictions in both cases for conspiracy to commit bank robbery under § 371 and § 2113). Here, appellant does not dispute that the robbery of the First National Bank of Ferrum, whose deposits were insured by the Federal Deposit Insurance Corporation, is a federal offense under 18 U.S.C. § 2113(a) & (d). As a result, the district court had jurisdiction over a charge of conspiracy to violate that federal statute under 18 U.S.C. § 371.

B.

Prior to appellant's first trial, FBI investigators questioned Sharon Wagner three times regarding the bank robbery and each time

4

recorded the substance of her responses in a typewritten FBI 302 report. In her first interview on October 8, 1993, she identified Lester Fuller and Rodney Van Wright as the individuals who were responsible for the bank robbery. Soon after making this statement, Sharon Wagner was convicted on unrelated state charges and incarcerated in a Botetourt County jail. While she was in jail, FBI investigators conducted two more interviews with her concerning the bank robbery -- one in January 1994 and the other in February 1994. However, in these interviews, she implicated appellant and her brother, Anthony Wagner, as the bank robbers.

On counsel's motion, the second and third FBI 302s were turned over to appellant, but the October 1993 302 was apparently not disclosed.**3** At trial, Sharon Wagner testified for the government that she had overheard appellant and her brother, Anthony Wagner, plan the bank robbery at her house, that appellant had shown her the money following the robbery, and that she had accompanied appellant and Wagner to New York to spend the stolen money. J.A. at 119-50. In addition, she admitted to having lied to FBI investigators in October 1993 when she had falsely implicated Fuller and Van Wright as the bank robbers in an effort to protect her brother and appellant. J.A. at 111, 165-166.

Appellant challenges his conspiracy conviction from his first trial claiming that government suppression of the FBI 302 report summarizing Sharon Wagner's October 1993 statement to investigators violated his due process rights as established in Brady v. Maryland, 373 U.S. 83, 87 (1963).

Under Brady and its progeny, the prosecution's failure to disclose

_____

**3** The district court failed to resolve the dispute as to whether the October 1993 302 had, in fact, been furnished to the defense. In footnote 4 of Appellee's brief, the government adheres to its assertion that the disputed 302 report was given to appellant prior to trial. However, in light of appellant's unchallenged argument that the October 1993 302 was not Bates stamped, as were the January and February 1994 302s, as well as corroboration from counsel for Ellis' co-defendant in the first trial, we assume for the purposes of this appeal that the 302 was, in fact, not furnished prior to the first trial. See Joint Appendix at 74.

5

"evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Kyles v. Whitley, 115 S.Ct. 1555, 1565 (1995); Hoke v. Netherland, 92 F.3d 1350, 1356 (4th Cir.), cert. denied, 117 S.Ct. 630 (1996). Evidence is "favorable" not only when it would tend to exculpate the accused, but also where it can be used to impeach government witnesses. United States v. Trevino, 89 F.3d 187, 189 (4th Cir. 1996); United States v. Bagley, 473 U.S. 667, 682 (1985). However, where the prosecution fails to disclose evidence favorable to the accused, such evidence is material "only where there exists a `reasonable probability' that had the evidence been disclosed the result of the trial would have been different." Wood v. Bartholomew, 116 S.Ct. 7, 10 (1995); Kyles, 115 S.Ct. at 1566. A "reasonable probability" of a different result is shown when the government's failure to disclose evidence "undermines confidence in the outcome of the trial." Kyles, 115 S.Ct. at 1566 (citing Bagley, 473 U.S. at 668).

In response to appellant's claim of reversible error, the government first contends that its Brady obligations were discharged by defense counsel's lack of due diligence in requesting the disputed 302 report at trial. See United States v. Kelly, 35 F.3d 929, 936 (4th Cir. 1994) ("when defense counsel could have discovered the evidence through reasonable diligence, there is no Brady violation if the government fails to produce it."); United States v. Wilson, 901 F.2d 378, 380 (4th Cir. 1990) ("the Brady rule does not apply if the evidence in question is available to the defendant from other sources." (quoting United States v. Davis, 787 F.2d 1501, 1505 (11th Cir.), cert. denied, 479 U.S. 852 (1986))).

We reject this argument for the following reasons. First, such a claim glosses over the substantial efforts made by defense counsel to obtain the evidence in dispute. Over a month before trial defense counsel filed a Motion for Exculpatory Information calling upon the court to "enter an order pursuant to Brady v. Maryland, 373 U.S. 83 (1963), and Giglio v. United States, 405 U.S. 150 (1972), directing the U.S. Attorney to provide him with the following: (a) All information of whatever form, source or nature which tends to exculpate the defendant either through indication of his innocence or the potential impeachment of any government witness . . . ." J.A. at 27. In

6

response, the government provided the defense with copies of Sharon Wagner's January and February 1994 FBI 302s. However, it apparently failed to turn over the October 1993 302 despite the government's later representation at trial that it had "in an attempt to be fair minded and open in this matter provided all those 302s to defense counsel." J.A. at 107.

The government argues that appellant was obligated to renew his request despite these assurances. However, nothing in Sharon Wagner's testimony from Trial #1 indicates the existence of the October 1993 FBI 302. At best, her trial admission that she had falsely implicated Fuller and Van Wright when first questioned shows only that defense counsel knew the substance of her initial statement, not the existence of a transcribed summary that could be used to support appellant's theory of the case and to impeach Sharon Wagner's credibility as a witness. Having recognized its Brady obligation to disclose the type-written FBI summaries of Sharon Wagner's prior statements, the government may not now deny its duty upon its failure to follow through.[4] Thus, we conclude that defense counsel's failure to renew his request at trial does not discharge the prosecution's obligations under Brady.

Despite his diligence, appellant must show that the undisclosed FBI 302 was both favorable to the defendant and material in order to demonstrate constitutional error. United States v. Hoyte, 51 F.3d 1239, 1241 (4th Cir. 1995). By any measure, the October FBI 302 is favorable to appellant. As exculpatory evidence, it implicates Fuller and Van Wright in the bank robbery and comports with appellant's theory of the case. As impeachment evidence, it reveals inconsistencies in Sharon Wagner's accounts to investigators that could be used to impugn her credibility as a witness.

The more difficult question focuses on the materiality of the suppressed report and whether "there exists a `reasonable probability'

_____

[4] See Barnes v. Thompson, 58 F.3d 971, 984 (4th Cir.) (concurrence of Murnaghan, J.) ("A reasonable defendant would not have looked into the matter any further once the prosecuting attorney represented that the Commonwealth did not possess exculpatory evidence."), cert. denied, 116 S.Ct. 435 (1995).

that had the evidence been disclosed the result at trial would have been different." Wood, 116 S.Ct. at 10. The Supreme Court first considered standards of materiality in United States v. Augurs, 427 U.S. 97 (1976), where it discussed three separate situations in which a Brady claim might arise and adopted a separate materiality standard for each.[5] Subsequently, in Bagley, the Court rejected any difference between impeachment and exculpatory evidence for Brady purposes and consolidated the "no request/general request" and "specific request" scenarios under the same "reasonable probability of a different result" standard. 473 U.S. at 682.[6] More recently, in Kyles, the Court reaffirmed its Bagley formulation and further explored four aspects of materiality that guide application of the standard.[7]

First, Kyles explains what is not required in demonstrating materiality -- a defendant does not have to show by a preponderance of the evidence that disclosure of the evidence would have resulted in acquittal. Kyles, 115 S.Ct. at 1565-66; Hays v. State of Alabama, 85

_____

[5] **See Jean v. Collins**, 107 F.3d 1111, 1119 (4th Cir. 1997) (concurrence of Hamilton, J.); Kyles, 115 S.Ct. at 1565, n.7. The first situation, where the prosecution introduced testimony at trial that it knew or should have known was perjured, required reversal "if there is any reasonable likelihood that the false testimony could have affected the jury." Augurs, 427 U.S. at 103. In the second case, where the government failed to turn over a specific kind of exculpatory evidence requested by the defense, such non-disclosure was "seldom, if ever, excusable". Id. at 106. Finally, in the third category, where the government failed to turn over exculpatory evidence either not requested or requested in a general way, reversal was necessary only when withholding the evidence would be "of sufficient significance to result in the denial of the defendant's right to a fair trial." Id. at 108.

[6] As the Court explained, "(t)he evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Bagley, 473 U.S. at 682 (opinion of Blackmun, J.); id. at 685 (White, J., concurring in part and concurring in judgment). "A `reasonable probability' is a probability sufficient to undermine confidence in the outcome." Id. at 682.

[7] The Kyles Court restricted its materiality analysis to Brady situations caused by prosecutorial omissions and did not "address any claim under the first Augurs category." Kyles , 115 S.Ct. at 1565 & n.7.

8

F.3d 1492, 1498 (11th Cir.) (interpreting <u>Kyles</u> to mean that undisclosed evidence can require a new trial even if it is more likely than not that a jury seeing the new evidence will still convict), <u>cert. denied</u>, 117 S.Ct. 1262 (1997). Second and related, it discussed what is required -- a "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." <u>Kyles</u>, 115 S.Ct. at 1566. Third, the Court explained that once <u>Brady</u> error is found to be material, further harmless error review is unnecessary as "`a reasonable probability that, had the evidence been disclosed to the defense, the result of the trial would have been different' necessarily entails the conclusion that the suppression must have had `substantial and injurious effect or influence in determining the jury's verdict.'" <u>Id.</u> (internal citations omitted); <u>see Gilday v. Callahan</u>, 59 F.3d 257, 268 (1st Cir.) (noting that "the <u>Bagley</u> materiality standard necessarily requires a court to find an impact on the jury verdict sufficiently substantial to satisfy the <u>Brecht</u> harmless error test."), <u>cert. denied</u>, 116 S.Ct. 1269 (1996). And finally, it noted that while courts of necessity examine undisclosed evidence item-by-item, their materiality determinations must evaluate the cumulative effect of all suppressed evidence to determine whether a <u>Brady</u> violation has occurred. <u>Id.</u> at 1567, n.10.

Appellant argues that the undisclosed 302 report is material in two respects. First, Sharon Wagner's initial statement could have strengthened his claim that he was being tried for a crime committed by Lester Fuller. In support of his claim for reversal, appellant relies on our decisions in <u>McDowell v. Dixon</u>, 858 F.2d 945 (4th Cir. 1995), and <u>Norris v. Slayton</u>, 540 F.2d 1241 (4th Cir. 1976).**8** However, unlike those cases where defense counsel was unaware of the exculpatory

_____

**8** In <u>Norris</u>, a police report describing a rape victim's hesitation during her initial identification of the defendant was not disclosed to the defense. Subsequently at trial, the victim testified that when she first confronted Norris, she was certain that he had attacked her. <u>Norris</u>, 540 F.2d at 1244. In <u>McDowell</u>, the victim's initial statements to police were that her attacker was white. Defense counsel was told only of the victim's subsequent description of her assailant -- that he was black, with a medium afro and a medium build. At trial, the victim testified that she had always described her attacker as a black man with flat hair, big eyes, and a flat nose. <u>McDowell</u>, 858 F.2d at 947.

9

evidence until after trial, here Sharon Wagner admitted both on direct and on cross-examination at Trial #1 that she had told FBI investigators in October 1993 that Lester Fuller and Rodney Van Wright had robbed the bank. J.A. at 111, 165-66. Thus, unlike McDowell and Norris where the contrast between the exculpatory evidence and the witnesses' in-court testimony brought into question their credibility, here Sharon Wagner's prior statement supports her trial testimony that she had initially lied to FBI investigators in order to protect her brother and appellant.

The government contends that the disclosure of the exculpatory information at Trial #1 aligns this case closely with the facts in United States v. Curtis, 931 F.2d 1011 (4th Cir. 1991). In that case appellant Curtis challenged his possession and conspiracy convictions arguing that the prosecution's failure to disclose an exculpatory memorandum summarizing a witness's initial statement to police violated his right to a fair trial. The Curtis court rejected appellant's claim and distinguished Norris based on two factors: (1) that the appellant knew about the witness's exculpatory statement prior to trial, and; (2) that the witness testified about his prior statement at Trial #1 and was cross-examined by appellant concerning it. Id. at 1014. Admittedly, the facts of the instant case differ in that only the second factor is present here. However, because Sharon Wagner testified at trial to her initial false identification and was cross-examined regarding it, we believe that disclosure of the actual 302 report would not, within reasonable probability, have caused a different result. See United States v. Manning, 56 F.3d 1188, 1198 (9th Cir. 1995) (noting that failure to disclose an investigative report identifying an alternative suspect does not require reversal where defendant was able to discuss alternative suspect with interviewing officer on cross-examination and again on recross-examination).**9**

As a second line of attack, appellant argues that the October 302 report reveals a number of inconsistencies (in addition to naming Fuller and Van Wright as the bank robbers) which appellant would have

_____

**9** Appellant's subsequent conviction on the substantive crime (unarmed bank robbery) in his second trial, after having received the October 1993 report, only further supports our belief that the result would not have been different.

10

used to impeach Sharon Wagner's trial testimony. This court has often stressed that "when the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within this general rule." Jean, 107 F.3d at 1115 (citing Giglio, 405 U.S. at 153-54).

At trial, Sharon Wagner claimed on cross-examination that she lied only twice in her initial interview with FBI investigators: she lied about her name and she lied in identifying Fuller and Van Wright as the bank robbers. J.A. at 166. Appellant claims that the government's failure to disclose the October 302 report prevented him from impeaching Sharon Wagner on this point. As a result, the jury was not informed that she had originally told investigators that Anthony Wagner was not her brother, that she had slept until 2:00 p.m. on the day of the robbery, and that she claimed to have overheard Fuller and Van Wright conspiring to rob the bank. Assuming these statements to be inconsistent, we find that these details would have provided only cumulative impeachment of Sharon Wagner's trial testimony and do not rise to a level that undermines our confidence in the verdict.

Our decision in Hoyte provides analogous circumstances. 51 F.3d 1239 (4th Cir. 1995). In Hoyte, appellant was not provided with a statement made by government witness Densie Beckford in which Beckford failed to single out which of the defendants had lured the victim into the car. Appellant argued that were the statement to be false, it could be used to impeach Beckford's trial testimony and would "tend to show that he kept changing his story until he invented a version that the government liked." Id. at 1243. In rejecting Hoyte's appeal, we agreed with the findings of the trial court that use of the undisclosed statement to attack credibility "would not have changed the outcome because Beckford was impeached in so many other ways." Id.[10]

_____

[10] See also Hays, 85 F.3d at 1498-99 (11th Cir. 1996); United States v. Graham, 83 F.3d 1466, 1474 (D.C. Cir. 1996) (concluding that use of polygraph results would not have significantly aided impeachment where the witness had already admitted the deceptions in other contexts); cf. United States v. Cuffie, 80 F.3d 514, 518 (D.C. Cir. 1996) (arguing evidence of perjury was material and that impeachment evidence is cumulative "only if the witness was already impeached at trial by the same kind

11

Similarly here, further impeachment of Sharon Wagner by highlighting additional inconsistencies between her trial testimony and her October 1993 statement would not, within reasonable probability, have led to a different result. From the partial trial record before us, it is evident that Sharon Wagner admitted to having lied a number of times: lying to get into the country (J.A. at 152, 162), lying to get a Virginia drivers license and a Social Security card (J.A. at 109, 151), lying to get a job (J.A. at 153), being convicted of four misdemeanors involving dishonesty (J.A. at 110, 151), and lying initially about who was responsible for the bank robbery (J.A. 110-11, 165-66, 178). In addition, the jury learned that she had allowed other individuals to sell crack out of her residence (J.A. at 155, 191), and that she had agreed to testify as part of her own plea agreement (J.A. 115-117, 159-61), which further tarnished her credibility as a witness. As a result of this testimony, her additional lies to the FBI are either insignificant or mere permutations of her "big" lie as to who robbed the bank. In any estimation, their cumulative effect is not material.

Thus, considering the cumulative effect of the suppressed evidence,

_____

of evidence."). Hays is a particularly apt case for comparison, for there the appellant argued that the state had violated its Brady obligation by failing to disclose some 20 statements made by Knowles, the state's main witness, which could have aided impeachment. Hays, 85 F.3d at 1497. While appellant noted at least 4 inconsistencies that could have been highlighted only by reference to the suppressed statements, the court rejected this argument explaining:

> Taken together, these assertions do not undermine confidence in the verdict. The main reason for this is that most of the asserted uses of the suppressed statements would have been redundant, because Hays's counsel in fact elicited testimony from Knowles on the witness stand acknowledging that he had been inconsistent on many of the listed points. And on others (particularly the relatedness of the murder and the cross-burning), no obvious reason suggests that the jury would have regarded the inconsistency as particularly significant. Therefore, we conclude that Petitioner's argument on the materiality of the alleged Brady statements fails.

Id. at 1499.

12

we find that the disputed 302 report fails "to put the whole case in such a different light as to undermine our confidence in the verdict." Kyles, 115 S.Ct. at 1566. As Kyles explains, whether evidence withheld is material is not a sufficiency of evidence test. Id. But by the same token, post-Kyles we do not ignore other evidence presented at trial in determining our confidence in the outcome. **11** Instead, we evaluate the whole case, taking into account the effect that the suppressed evidence, had it been disclosed, would have had on the evidence considered at trial.

Even from the partial record provided to this court, it is clear that Sharon Wagner's testimony was not the only evidence linking appellant to the conspiracy. Appellant's cousin Rita Ellis claimed to have overheard conspiratorial conversations between Anthony Wagner and Appellant (J.A. at 215); and testified that she was asked to drive the getaway car, that she was to get $5000 for driving the getaway car (J.A. at 218), and that on the day of the robbery she saw Anthony Wagner and Leroy Ellis come out of the woods and climb into the trunk. (J.A. at 231).

In light of this additional testimonial evidence and our conclusion that the disputed 302 contains neither unknown exculpatory information nor material impeachment evidence, our confidence in the jury's verdict remains strong. Accordingly, we will not disturb the conspiracy conviction obtained at Trial #1.

_____

**11 See Wood**, 116 S.Ct. at 11 ("In short, it is not `reasonably likely' that disclosure of the polygraph results . . . would have resulted in a different outcome at trial. Even without Rodney's testimony, the case against respondent was overwhelming . . . . In the face of this physical evidence, as well as Rodney and Tracy's testimony -- to say nothing of the testimony by Bell that the state likely could introduce on retrial -- it should take more than supposition on weak premises offered by the respondent to undermine a court's confidence in the outcome.") (emphasis added); Hoke, 92 F.3d at 1357 ("Nevertheless, we are convinced beyond any doubt that, in light of the overwhelming evidence that Still was raped by Hoke, no reasonable juror would conclude that this single act of anal intercourse almost a year earlier was material to the question of whether Still consented to having sex with Hoke.") (first emphasis added).

13

C.

Third, Appellant argues that the district court erred in admitting Sharon Wagner's February 1994 FBI 302 into evidence and that his Motion in Limine filed prior to trial objecting to the admission of certain statements preserves this issue on appeal.

As this court recently explained in United States v. Williams, 81 F.3d 1321 (4th Cir. 1996), "motions in limine may serve to preserve issues that they raise without any need for renewed objections at trial, just so long as the movant has clearly identified the ruling sought and the trial court has ruled upon it." Id. at 1325 (emphasis added). Here, the district court deferred its decision on appellant's motion prior to trial, noting its inability to rule on the admission of the statements in a vacuum.**12** Thus, appellant's subsequent failure to object, both when the prosecutor offered the 302 into evidence (J.A. at 203) and when the court accepted it into evidence for limited purposes (J.A. at 255-56), requires that we review admission of the 302 for plain error. United States v. Wilkerson, 84 F.3d 692, 695 (4th Cir. 1996); United States v. Brewer, 1 F.3d 1430, 1434 (4th Cir. 1993) (citing F.R.E. 103(a)(1), 103(d) and F.R.C.P. 52(b)).

To warrant reversal under this high standard, a reviewing court must "(1) identify an error, (2) which is plain, (3) which affects substantial rights, and (4) which seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." Brewer, 1 F.3d at 1434; see also United States v. Olano, 507 U.S. 725, 731-32 (1993) (clarifying the standard for "plain error" review by the courts of appeals under F.R.C.P. 52(b)).

Here, our task is made easy by the lack of error, much less plain error, in the district court's admission of the February 302. Appellant is simply wrong in assuming that "the only possible avenue for admitting this evidence was Rule 801(d)(1)(B) of the Federal Rules of Evidence." Brief of Appellant at 38. Even before the adoption of the federal rules, this court recognized that "where a cross-examiner has

_____

**12** On the partial record before us, which does not include Appellant's written Motion in Limine filed prior to the first trial, we are unable to determine whether or not appellant clearly identified the ruling sought.

endeavored to discredit a witness by prior inconsistent statements, it is sometimes permissible to offset the damage by showing prior consistent utterances." Schoppel v. United States, 270 F.2d 413, 417 (4th Cir. 1959).

The adoption of the Federal Rules of Evidence, specifically 801(d)(1)(B), did not replace the admissibility of prior consistent statements to rehabilitate a witness, but merely allowed a certain subset of these statements to be used as substantive evidence of the truth of the matter asserted.[13] This expanded use under the rule does not extend to all prior consistent statements, but only to those offered to rebut a charge of recent fabrication or improper influence or motive. Tome v. United States, 115 S.Ct. 696, 701 (1995); United States v. Acker, 52 F.3d 509, 517 (4th Cir. 1995); United States v. Rubin, 609 F.2d 51, 67 (2d Cir. 1979) (Friendly, J., concurring), aff'd on other grounds, 449 U.S. 424 (1981). Moreover, it is this restriction on the types of prior consistent statements admissible under the rule that gives rise to the "pre-motive rule" -- a requirement that such consistent statements be made before the alleged fabrication, improper influence or motive came into being. Tome, 115 S.Ct. at 701.[14]

_____

[13] The Note of the Advisory Committee referring to 801(d)(1)(B) explains the change:

> Prior consistent statements traditionally have been admissible to rebut charges of recent fabrication or improper influence or motive but not as substantive evidence. Under the rule they are substantive evidence. The prior statement is consistent with the testimony given on the stand, and, if the opposite party wishes to open the door for its admission in evidence, no sound reason is apparent why it should not be received generally.

[14] In Tome, the Supreme Court explains that:

> [T]he forms of impeachment within the Rule's coverage are the ones in which the temporal requirement makes the most sense. Impeachment by charging that the testimony is a recent fabrication or results from an improper influence or motive is, as a general matter, capable of direct and forceful refutation through introduction of out-of-court consistent statements that predate the alleged fabrication, influence or motive. A consistent statement that predates the motive is a square rebuttal of the charge that the testimony was contrived as a consequence of that

15

In contrast, where prior consistent statements are not offered for their truth but for the limited purpose of rehabilitation, a number of courts, including ours, have concluded that Rule 801(d)(1)(B) and its concomitant restrictions do not apply. Engebretsen v. Fairchild Aircraft Corporation, 21 F.3d 721, 730 (6th Cir. 1994); United States v. Bolick, 917 F.2d 135, 138 (4th Cir. 1990); United States v. Castillo, 14 F.3d 802, 806 (2d Cir. 1994); United States v. Casoni, 950 F.2d 893, 905-06 (3d Cir. 1991); United States v. Andrade, 788 F.2d 521, 532-33 (8th Cir. 1986); United States v. Harris , 761 F.2d 394, 399 (7th Cir. 1985) (citing United States v. Parodi , 703 F.2d 768, 785 (4th Cir. 1983)).**15** Instead, courts employ a more relaxed standard to deter-

_____

motive. By contrast, prior consistent statements carry little rebuttal force when most other types of impeachment are involved.

Id. at 701. While the Court's opinion, handed down on January 10, 1995, pre-dates Appellant's first trial in December 1994, its holding was consistent with the rule followed by the Fourth Circuit prior to Tome. See United States v. Henderson, 717 F.2d 135, 138 (4th Cir. 1983) ("[W]e have accepted the gloss on Federal Rule of Evidence 801(d)(1)(B) that a prior consistent statement is admissible under the rule only if the statement was made prior to the time the supposed motive to falsify arose.").
**15** In Bolick we "assume [d] without deciding, that the prior consistent statements were admitted as rehabilitation and that they are not subject to the requirements of Rule 801(d)(1)(B)." Id. at 138. At the same time, we characterized the state of the law in this circuit, explaining that:

> There is considerable authority for the proposition that the requirements of Rule 801(d)(1)(B) must be met only when a prior consistent statement is offered for its truth and that general principles of trial court discretion apply when a prior consistent statement is admitted for some other purpose such as rehabilitation or background. . . . Although we have not had occasion to address it squarely, we may have endorsed the proposition in United States v. Parodi, 703 F.2d 768, 785-86 (4th Cir. 1983).

Id. at 138 (internal citations omitted); but cf. Henderson, 717 F.2d at 138 n.1 (noting that the decision in Parodi is fully consistent with the court's decision to require the absence of a motive to fabricate when the prior consistent statement was made for admission under Rule 801(d)(1)(B)).

For a thorough discussion of the law in other circuits on this issue, see Frank W. Bullock, Jr. & Steven Gardner, Prior Consistent Statements

16

mine "whether the particular consistent statement sought to be used has some rebutting force beyond the mere fact that the witness has repeated on a prior occasion a statement consistent with his trial testimony." Castillo, 14 F.3d at 806 (quoting United States v. Pierre, 781 F.2d 329, 331 (2d Cir. 1986)). Such countering effect has been recognized where the prior consistent statements serve to clarify "whether the impeaching statements really were inconsistent within the context of the interview, and if so, to what extent." Harris, 761 F.2d at 400; see also Pierre, 781 F.2d at 331 (noting that statements "offered to clarify or amplify the meaning of the impeaching inconsistent statement" have significant rebutting force); Rubin, 609 F.2d at 70 (Friendly, J., concurring) (arguing that use of prior consistent statements for rehabilitation should be generously allowed "since they bear on whether, looking at the whole picture, there was any real inconsistency"). Moreover, such use is in accord with the "Doctrine of Completeness" which provides that ". . . the opponent, against whom a part of an utterance has been put in, may in his turn complement it by putting in the remainder, in order to secure for the tribunal a complete understanding of the total tenor and effect of the utterance." Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 171 (1988) (quoting 7 J. WIGMORE, EVIDENCE IN TRIALS AT COMMONLAW § 2113, p.653 (J. Chadbourn rev. 1978)).

In light of this distinction, we find Appellant's objections inapposite. Because the statements contained in the February 302 were not offered for the truth of the matter asserted, the restrictions of Rule 801(d)(1)(B) and the "pre-motive rule" of Tome have no effect.[16]

_____

and the Premotive Rule, 24 F.S.U. L. Rev. 509, 521-22 nn. 86-96 (1997) (noting that the Second, Third, Fourth, Sixth, Seventh, and Eighth Circuits have found prior consistent statements for rehabilitative purposes not to be governed by Rule 801(d)(1)(B) and the Ninth alone concludes that such statements are either admissible under Rule 801(d)(1)(B) or not at all).

[16] The court in Tome explicitly limited the breadth of its rule noting that "[o]ur holding is confined to the requirements for admission under Rule 801(d)(1)(B)". 115 S.Ct. at 705. However, we note without deciding that even were the "pre-motive rule" to apply, a witness's statement made after arrest but before the signing of a plea agreement might qualify as "not hearsay" under the rule in this circuit. Henderson, 717 F.2d at 138.

17

Here, the district court properly told the jury to use the prior consistent statements only to assist in determining the credibility of the witness.**17** Appellant did not object to this limitation, and we follow the general rule that assumes a jury to have followed the court's instructions. United States v. Shannon, 512 U.S. 573, 584 (1994).

On cross-examination, appellant strove to demonstrate that Sharon Wagner's February 1994 statement to FBI investigators was at odds with her trial testimony. He pointed to specific discrepancies concerning her trial testimony (1) that she could identify the driver of the getaway car; (2) that she had been offered $5,000 to drive the getaway car, and; (3) that she had seen appellant on the day of the robbery walking towards her house with a knitted wool mask in hand. J.A. at 175-77, 198-99 & 200-02. In so doing, appellant made a conscious decision to highlight these inconsistencies in order to undermine Sharon Wagner's credibility in the eyes of the jury. The rules allow such tactics, but they do not allow appellant to have his cake and eat it too. See Parodi, 703 F.2d at 786 (citing the reasoning of the district court affirmed by the Seventh Circuit in United States v. Baron, 602 F.2d 1248 (7th Cir. 1979)).**18**

_____

**17** The entirety of the court's instruction is as follows:

> THE COURT: Ladies and gentlemen, I have decided to admit Government Exhibit No 1. If you recall it was a portion of a statement that was used in cross-examination of Ms. Wagner and I'll need to give you a special limiting instruction about this. This is a statement that she gave to the FBI. You cannot use it for proof of the charges here. Her testimony is the only thing that you can consider with regard to whether the government has proved its charges or not. The only reason I'm letting this come into evidence is so you can compare it, if you want to -- you don't have to, this is up to you -- in making your credibility determination to see whether she has made any -- if her testimony is any different from what she gave the FBI agent, so that's the sole purpose that it's coming in for is in judging her credibility. As I say, we will need a cleaned up copy, but it will be admitted.

J. A. at 255-56.

**18** In arriving at this conclusion, we are guided by the Sixth Circuit's decision in Engebretsen, which upheld a lower court's admission of

18

Instead, the "Doctrine of Completeness" operates to ensure that "when one party has made use of a portion of a document, such that misunderstanding or distortion can be averted only through presentation of another portion, the material required for completion is ipso facto relevant and therefore admissible . . . ." Beech Aircraft Corp., 488 U.S. at 172; see also Parodi, 703 F.2d at 786 (approving of Judge Friendly's observation in Rubin that "failure to admit the rehabilitating testimony because of possible motive to fabricate, would be counter to the `great principle of completeness, now enacted in Rule 106'").[19] Accordingly, we hold that the district court did not err in

_____

experts' accident reports as prior consistent statements offered to rehabilitate the credibility of two witnesses. In Engebretsen, the defendant called two experts to testify to their post-accident investigations. While neither expert referred to their accident report on direct or re-direct, plaintiff's counsel referenced the reports on cross-examination in an attempt to impeach the witnesses by raising inconsistencies between their reports and their trial testimony. At the close of defendant's case, defendant moved for admission of these reports. The district court initially reserved its ruling, and later decided to admit the reports into evidence.

In holding that admission of the reports was in the trial court's discretion, the Sixth Circuit explained that the strictures of 801(d)(1)(B) did not apply:

> [P]rior consistent statements offered for the limited purpose of rehabilitating a witness's credibility [are] not subject to the strictures of Rule 801(d)(1)(B) . . . . This use of prior consistent statements for rehabilitation is particularly appropriate where, as here, those statements are part of a report or interview containing inconsistent statements which have been used to impeach the credibility of the witness. Prior consistent statements which are used in this matter [sic] are relevant to whether the impeaching statements really were inconsistent within the context of the interview, and if so, to what extent. This rehabilitative use of prior consistent statements is also in accord with the principle of completeness promoted by Rule 106.

Id. at 730 (quoting Harris, 761 F.2d at 399-400).

**19** We note that our analysis does not require the introduction of the document into evidence. In like circumstances, the Doctrine of Completeness renders prior consistent statements relevant and admissible

19

admitting the 302 into evidence for the sole purpose of assisting the jury's determination of Sharon Wagner's credibility as a witness.

D.

Finally, appellant challenges the sufficiency of the evidence supporting his conspiracy conviction. On direct review of this issue, we honor the rule that a jury verdict "must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." United States v. Burgos, 94 F.3d 849, 862 (4th Cir. 1996) (en banc) (emphasis in original) (quoting Glasser v. United States, 315 U.S. 60, 80 (1942)), cert. denied, 117 S.Ct. 1087 (1997). Sustaining a conspiracy conviction under 18 U.S.C.§ 371 requires that the government prove: (1) an agreement between two or more people to commit a crime, and (2) an overt act in furtherance of the conspiracy. United States v. Chorman, 910 F.2d 102, 109 (4th Cir. 1990). The existence of a "tacit or mutual understanding" between conspirators is sufficient evidence of a conspiratorial agreement. Id. Such proof need not be direct, but may be inferred from circumstantial evidence. Burgos, 94 F.3d at 858. Moreover, once a conspiracy is established, "even a slight connection between a defendant and the conspiracy is sufficient to include him in the plan." United States v. Laughman, 618 F.2d 1067 (4th Cir. 1980).

At trial, both Sharon Wagner and Rita Ellis testified that they heard appellant and Anthony Wagner discussing plans to rob a bank. According to these two witnesses, appellant and Anthony Wagner made plans to "make a withdrawal" from the bank, to get masks and sweatshirts that could be worn during the robbery, to steal a getaway car, to pay Rita Ellis $5,000 for her help in aiding their escape, to

_____

under Rules 401 and 402. However, it remains for the parties to raise and the trial courts to determine whether or not allowing the document to enter the jury room would unduly prejudice the cross-examining party. The court has a number of weapons to guard against such prejudicial effect: e.g., admitting statements in the document through testimony, having the document read to the jury, or instructing the jury as to the limited purpose of the exhibit. However, these options are best left to the discretion of the trial court. Engebretsen, 21 F.3d at 730 n.2.

burn their clothes following the robbery, and to travel after the robbery to New York and then overseas to Belize. Even on these limited facts, such evidence clearly supports the inference that appellant was part of the agreement to rob the bank.

In addition, other testimony reveals a number of overt acts performed in furtherance of the conspiracy. According to the government's witnesses, appellant and Wagner drove to the bank in a stolen car. Following the robbery, they abandoned the stolen car and hid in the trunk of another car driven by Rita Ellis. They ordered others to burn the clothing they had worn during the robbery, and then left town, going first to North Carolina and then to New York where they spent some of the stolen money and paid other members of the conspiracy for their part in the crime. As a result, we conclude that the jury had sufficient evidence to support each element of a conspiracy conviction under 18 U.S.C. § 371.

III.

In challenging his conviction for unarmed bank robbery in Trial #2, appellant cites a string of errors he contends justify reversal. Thematically, these challenges fall roughly into three categories of errors: incorrect jury instructions, erroneous evidentiary rulings, and improper prosecutorial actions. We again consider each of appellant's arguments in turn.

A.

Within the first of these three categories, appellant alleges that three errors made by the district court independently warrant reversal of appellant's unarmed bank robbery conviction: issuing a jury instruction on aiding and abetting liability, rejecting appellant's proposed instruction on reasonable doubt, and declining to answer the jury's question as to the identity of individuals in a photograph. For the reasons that follow, we reject appellant's claim of reversible error.

1.

At the close of the evidence in Trial #2, the district court judge

21

gave an instruction to the jury allowing them to find appellant guilty of bank robbery as either a principal or an aider and abettor. While in deliberations, the jury asked the court whether "aiding and abetting" required proof that appellant was actually in the bank.[20] Rather than answer the jury's question directly, the court instead responded by again reading the standard aiding and abetting instruction.

Against, this factual backdrop, appellant raises a number of objections. First, he argues that the prosecution's decision to argue that appellant was inside the bank during the robbery constructively narrowed the indictment. As a result, appellant claims to have been unfairly surprised in violation of his Fifth and Sixth Amendment rights to notice and an adequate opportunity to confront the charges against him by the jury charge on aiding and abetting. Second, appellant contends that the aiding and abetting instruction was unsupported by sufficient evidence. Last, he argues that the court erred in responding to the jury's question by repeating the instruction for aiding and abetting.

We consider de novo whether a district court has properly instructed a jury on the statutory elements of an offense. United States v. Rahman, 83 F.3d 89, 92 (4th Cir.), cert. denied, 117 S.Ct. 494 (1996). However, "the decision of whether to give a jury instruction and the content of an instruction are reviewed for an abuse of discretion." United States v. Abbas, 74 F.3d 506, 513 (4th Cir.), cert. denied, 116 S.Ct. 1868 (1996). Furthermore, even where use or denial of a jury instruction is in error, reversal is warranted only when the error is prejudicial based on a review of the record as a whole. Ross v. St. Augustine's College, 103 F.3d 338, 344 (4th Cir. 1996).

We begin our analysis by considering appellant's constitutional and sufficiency claims to the initial aiding and abetting instruction. Because appellant initially failed to raise his challenge to this instruction before the district court in the manner prescribed by Rule 30 of

_____

**20** The jury's question was as follows: "Does the term aid and abet mean that he would actually have to be in the bank during the robbery or that he assisted in the planning of the robbery?" J.A. at 83 (underlined in original).

22

the Federal Rules of Criminal Procedure,[21] our review is limited to a determination of whether the district court committed plain error. United States v. McCaskill, 676 F.2d 995, 1001-02 (4th Cir. 1982).

Appellant contends that the government made a tactical choice to prosecute him as one of the two principals who had actually robbed the bank. He further claims that in so doing, the government constructively narrowed the indictment, unfairly surprising and depriving him of due process by allowing the jury to find him liable for aiding and abetting. For support, appellant draws on United States v. San Juan, 545 F.2d 314 (2d Cir. 1976), in which the Second Circuit overturned a defendant's conviction because the district court's jury instruction had "left open the possibility that the defendant could be held liable on a different theory than the one on which both parties had tried and argued the case." United States v. James, 998 F.2d 74, 79 (2d Cir. 1993) (discussing the holding in San Juan).

When the government or the court broadens the possible bases for conviction beyond those included in the indictment, a constructive amendment occurs which is per se reversible error. United States v. Williams, 106 F.3d 1173, 1176 (4th Cir. 1997). When evidence presented at trial differs from what is alleged in the indictment, a variance occurs. United States v. Fletcher, 74 F.3d 49, 53 (4th Cir.), cert. denied, 117 S.Ct. 157 (1996). However, such a variance does not violate a defendant's rights requiring reversal unless it prejudices him, either by surprising him at trial and hindering the preparation of his defense, or by exposing him to the danger of a second prosecution for the same offense. Id. Upon our careful review of the record, we find no constructive amendment, no fatal variance and no reason to believe that San Juan is controlling.

Count two of the indictment clearly charged appellant and others "as principles or aiders and abettors" with having violated 18 U.S.C. § 2113(a) & (d) (armed bank robbery) and 18 U.S.C. § 2 (aiding and abetting) and was sufficient to put appellant on notice of his potential

_____

[21] In pertinent part Rule 30 requires: "No party may assign as error any portion of the charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which that party objects and the grounds of the objection."

23

liability for aiding and abetting. Thus, far from broadening appellant's potential liability, this instruction merely conformed to the charges by the grand jury. Though this fact does not dispose of the possibility that appellant was prejudiced by the government's "constructive narrowing" of the indictment, it does preclude a finding of per se reversible error. See United States v. Morganstern, 933 F.2d 1108, 1115 (2d Cir. 1991) ("[W]here charges are `constructively narrowed' or where a generally framed indictment encompasses the specific legal theory or evidence used at trial, no constructive amendment occurs.").

However, under the facts of this case, we find no merit in the argument that the prosecutor's references to appellant's presence in the bank as "the only issue in the case" constructively narrowed the indictment in any prejudicial way. As the trial judge concluded in his post-trial Memorandum Opinion, this statement "did not limit the prosecutor's case, but instead illustrated only the issue that the prosecutor thought was the sticking point in the case." J.A. at 100.

In this respect, the actions of the government stand in marked contrast to the representations made by the prosecutor in San Juan. In that case, the government charged defendant with failing to report currency upon entering the United States. In trying the case, the prosecutor not only repeatedly emphasized his theory that the crime had taken place on the bus, but also affirmatively rejected the possibility, later included in the court's jury charge, that the crime could have taken place outside the bus. San Juan, 545 F.2d at 317. In United States v. Hobby, 702 F.2d 466 (4th Cir. 1983), our own court endorsed the Second Circuit's reasoning in San Juan commenting that defendant had been deprived of due process "since the prosecution had provided defense counsel with abundant reason to believe that he could and should focus his defense on the events and occurrences on the bus." Id. at 470.

While we continue to adhere to that principle, we find the facts in the instant case to be far less compelling. Here, the prosecutor's representations were significantly more equivocal and the potential for surprise to appellant substantially less likely. Indeed, far from a situation where appellant was led "to forego any defenses he might otherwise have asserted," the record here clearly reveals appellant's efforts to counter testimony presented by witnesses at trial that supported an

24

instruction on aiding and abetting. Because appellant does not explain and we cannot fathom how the prosecutor's representations resulted in unfair surprise and prejudiced the fairness of his trial, we conclude that there was no fatal variance between the indictment and the evidence offered at trial. Finally, we note that even were appellant correct that the prosecutor tried the case solely based on appellant's liability as a principal, such a conclusion "does not preclude the trial judge from giving an instruction on that theory where it deems such an instruction to be appropriate." United States v. Horton, 921 F.2d 540, 544 (4th Cir. 1990). Under the law, one is guilty of aiding and abetting if he assists the principal in committing a crime. Horton, 921 F.2d at 543. Moreover, one's physical location at the time of the robbery does not preclude the propriety of an aiding and abetting charge. See McCaskill, 676 F.2d at 1000-01 (driver of the getaway car liable as aider and abettor); United States v. Tarkington, 194 F.2d 63, 68 (4th Cir. 1952) (organizer of the robbery liable as aider and abettor). At the second trial, the government presented sufficient evidence to support an aiding and abetting charge. As the record demonstrates, four separate witnesses each testified to appellant's participation in conversations where plans to rob the bank were discussed. J.A. 269-76, 309-17, 347-49, & 371-72. Indeed, on a number of occasions, counsel for appellant specifically attacked these accounts, further undercutting any concern of unfair surprise. As a result, we encounter little hesitation in concluding that the instruction at issue has not "resulted in a miscarriage of justice or in the denial to appellant of a fair trial." McCaskill, 676 F.2d at 1002 (quoting United States v. Houston, 547 F.2d 104, 108 (9th Cir. 1976)).

2.

Additionally, we reject appellant's contention that the trial court erred in not giving his proposed jury instruction. While a trial court must instruct the jury on the defendant's theory of the case, it is not required to use the precise language requested. United States v. Smith, 44 F.3d 1259, 1270-71 (4th Cir. 1995) ("The district court is not required to give defendant's particular form of instruction, as long as the instruction the court gives fairly covers a theory that the defense offers."). Moreover, where the court correctly instructs the jury on reasonable doubt, it may properly reject a defense requested instruction on reasonable doubt as redundant. United States v. Russell, 971

25

F.2d 1098, 1109 (4th Cir. 1992). Here, appellant requested that jury be charged to find appellant not guilty if ". . . you believe that a bank robbery occurred but you have reasonable doubt that the defendant, rather than Lester Fuller or someone else, robbed the bank . . . ." J.A. at 81. The court rejected appellant's request but charged the jury in general terms that the government bore the burden of establishing guilt beyond a reasonable doubt. While appellant understandably would have preferred his version, we fail to find any abuse of discretion in the trial court's rejection of appellant's redundant instruction.[22]

3.

Last, we consider the trial judge's unwillingness to answer the jury's request to identify two men pictured in a Polaroid photograph. The photograph, which showed appellant and Anthony Wagner standing side-by-side, was introduced into evidence during appellant's cross-examination of government witness, Rodney Van Wright, and supported appellant's argument that the two men were roughly the same height. During deliberations the jury asked the court the following question: "Who are the two men standing next to each other in the photograph that is marked Defendant's Exhibit #12?" J.A. at 93. The court refused to answer and appellant objected arguing that such information went to a critical issue in the case-- the relative height of the two men.

At the outset, we acknowledge that "[w]hen a jury makes explicit its difficulties a trial judge should clear them away with concrete accuracy." Bollenbach v. United States, 326 U.S. 607 (1946); Horton, 921 F.2d at 546. Yet, by the same token, "the court must be careful not to invade the jury's province as fact finder." United States v. Blumberg, 961 F.2d 787, 790 (8th Cir. 1992); see also United States v. Nunez, 889 F.2d 1564, 1569 (6th Cir. 1989). Such a distinction is consistent with our fundamental belief that it is the court that provides

_____

**22** Additionally, we dismiss appellant's related claim that the district court abused its discretion by instructing jurors on the lesser included offense of unarmed bank robbery under 18 U.S.C.§ 2113(a). Appellant's subsequent acquittal on Count III clearly demonstrates that use of a firearm to commit the bank robbery was factually in dispute. Thus, we find that the court's instruction on unarmed bank robbery was not improper.

the legal yardstick and the jury that measures the evidence.**23** See Bollenbach, 326 U.S. at 614.

In contrast to the cases relied on by appellant, the trial court here was within its discretion in refusing to answer the jury's question. As the court recognized, a direct response would have gone far past recounting trial testimony and would have risked stamping the court's imprimatur on the factual conclusions proffered by appellant at trial. While we agree with appellant that the trial judge could have responded by having the appropriate part of the transcript read to the jury, such action was not requested by appellant and was, in any event, appropriately within the discretion of the trial court.

B.

Additionally, appellant argues that the court made three erroneous evidentiary rulings that require reversal of his bank robbery conviction: allowing Sharon Wagner to testify about her prior consistent statements, allowing the government to present evidence of appellant's travel to Belize, and allowing Rodney Van Wright to identify appellant as one of the two robbers pictured in the bank's surveillance photograph. In considering these claims, we are guided by our well-settled rule that "decisions regarding the admission and exclusion of evidence are peculiarly within the province of the district court, not

_____

**23** The full quotation from Bollenbach clearly reveals that the scope of court's obligation is not open-ended, but is limited to clarifying questions of law:

> The jury's questions, and particularly the last written inquiry in reply to which the untenable "presumption" was given, clearly indicated that the jurors were confused concerning the relation of knowingly disposing of stolen securities after their interstate journey had ended to the charge of conspiring to transport such securities. Discharge of the jury's responsibility for drawing appropriate conclusions from the testimony depended on discharge of the judge's responsibility to give the jury the required guidance by a lucid statement of the relative legal criteria. When a jury makes explicit its difficulties a trial judge should clear them away with concrete accuracy.

Id. at 612.

27

to be reversed on appeal absent an abuse of discretion." United States v. Loayza, 107 F.3d 257, 263 (4th Cir. 1997).

1.

As he had in Trial #1, appellant cross-examined Sharon Wagner extensively regarding her prior statements to FBI investigators, specifically emphasizing parts of her previous interviews that were at odds with her trial testimony. However, in contrast to the first trial, the government changed its tactics in Trial #2; instead of moving to admit the 302s into evidence, the prosecutor used them on redirect to elicit from Sharon Wagner other parts of the 302s that were consistent with her testimony on direct examination.

Nevertheless, appellant argues that the court erred in allowing Sharon Wagner to testify about her prior consistent statements to FBI investigators in January and February 1994 because such statements were inadmissible hearsay under Rule 801(d)(1)(B) of the Federal Rules of Evidence. Again, we believe that appellant is wrong. As we have already commented, the prior consistent statements at issue are not affected by the strictures of Rule 801(d)(1)(B) because they were used to rehabilitate an impeached witness and not offered for the truth of the matter asserted. See supra II.C. Having "opened the door" by cross-examining the witness on these statements, appellant may not now prevent the government from putting such highlighted inconsistencies in their proper context. As a result, we find appellant's reliance on our decision in Acker, where prior consistent statements were improperly admitted as substantive evidence under Rule 801(d)(1)(B), to be misplaced and conclude that the district court did not abuse discretion.

2.

As a second evidentiary objection, appellant attacks the district court's failure to exclude evidence of his travel to Belize two weeks after the bank robbery. Specifically, he argues that it was not relevant to the charges against him and that the court improperly allowed the jury to consider it as evidence of flight and infer consciousness of guilt. See United States v. Beahm, 664 F.2d 414, 420 (4th Cir. 1994) (concluding that a flight instruction was improper instruction where

28

the flight did not occur until three weeks after commission of the crime). Again we believe that the district court's admission of this evidence was on firm ground.

At Trial #2, Sharon Wagner testified to having heard appellant and Anthony Wagner make plans to leave Virginia after the bank robbery, traveling first to New York in order to spend some of the stolen money and then out of the country to Belize. J.A. at 316. Because such travel was part of the overall plan to rob the bank, we consider it highly probative in tending to show that appellant was one of the robbers. Likewise, we believe that the evidence of appellant's circuitous travel immediately following the robbery to Eden, North Carolina, then to New York, and then to Belize could properly be considered by the jury as evidence of flight. Appellant's characterization of a two-week gap between the bank robbery and his trip to Belize is not persuasive in light of the testimony presented at trial that described this trip as part of appellant's ongoing plan to escape detection by the police. Thus, we find no abuse of discretion.

3.

Finally, appellant claims that the district court improperly allowed Rodney Van Wright, a co-defendant in Trial #1, to identify appellant in a bank surveillance photograph by "the shape of his body". J.A. at 394. Again, we find appellant's argument to be without merit.

"A lay witness may give an opinion concerning the identity of a person depicted in a surveillance photograph if there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than the jury." United States v. Robinson, 804 F.2d 280, 282 (4th Cir. 1986) (quoting United States v. Farnsworth, 729 F.2d 1159, 1160 (8th Cir. 1984)). At Trial #2, Van Wright testified that he had known appellant for approximately five years, that he saw appellant on the day before and the day of the robbery, that he met appellant in New York a few days after the robbery, and that he traveled to Belize with appellant thereafter. In contrast, the jury saw appellant only during the trial. Thus, allowing Van Wright to assist the jury in identifying individuals in the bank photograph was proper, for ". . . testimony by those who knew defendants over a period of time and in a variety of circumstances offers to the

29

jury a perspective it could not acquire in its limited exposure to defendants." United States v. Allen, 787 F.2d 933, 936 (4th Cir. 1986). Particularly in this case, where the two men photographed were wearing masks and hooded sweatshirts, Van Wright's ability to recognize the defendant by the shape of his body was helpful to the jury and thus was properly admitted. See id. at 936 ("This fuller perspective is especially helpful where, as here, the photographs used for identification are less than clear.").

IV.

Finally, appellant insists that his conviction at Trial #2 for unarmed bank robbery must be overturned, first, because of the prosecution's reliance on the alleged perjury of Sharon Wagner and second, because of improper remarks made by the prosecutor in his closing statement. When faced with a claim of prosecutorial misconduct, we review a district court's factual findings for clear error; if, as here, no factual findings exist, our review is plenary. United States v. McDonald, 61 F.3d 248, 253 (4th Cir. 1995).

Initially, we consider appellant's contention that his conviction, based in part upon the perjured testimony of Sharon Wagner, violated his constitutional right to due process. The government violates its duty to deal fairly with a defendant where it either solicits testimony it knew or should have known to be false or allows such testimony to pass uncorrected. Kelly, 35 F.3d at 933. Such a violation is material and requires reversal where "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." Augurs, 427 U.S. at 103.

At Trial #2, Sharon Wagner testified that her brother was approximately five feet nine inches tall. Appellant claims that this was perjury. For support, he relies on Sharon Wagner's testimony five months earlier at Trial #1 in which she claimed to be unsure of her brother's height, but then agreed with the prosecutor that he was probably about five foot four inches tall. In addition, other evidence supports appellant's contention that Anthony Wagner was much shorter than five feet nine: an FBI "rap sheet" listed Antony Wagner as five feet two inches tall, government witness Dorla Enriquez testified that Sharon Wagner was several inches taller than Anthony Wagner, and a Polaroid photograph of appellant and Anthony Wagner introduced into evidence showed the two men to be roughly the same height

30

(appellant was measured during the trial to be five feet five and a half inches tall).

Appellant insists that the government's failure to correct Sharon Wagner's trial testimony requires reversal of his conviction for unarmed bank robbery. He argues that exposing this lie could have eliminated possible confusion as to the relative heights of Anthony Wagner and appellant caused by the conflict between Sharon Wagner's testimony and the Polaroid photograph of the two men. In addition, he claims that revealing this perjury could have led the jury to completely discount the credibility of the government's star witness and thus resulted in a different verdict.

Because we do not believe that Sharon Wagner's trial testimony was perjury, we do not reach the materiality of her statements. Estimations of height are matters of perception, not fact. As a result, in the absence of conclusive proof that Sharon Wagner actually knew how tall her brother was, the conflict between her testimony and other evidence presented at trial proves only that she was mistaken, not that she lied. Contrary to appellant's contention, we believe her testimony from Trial #1 serves more to establish her indecisiveness than her knowledge of her brother's height.[24] In addition, appellant fails to establish that the government knew or should have known that Sharon Wagner's estimation was wrong. Anthony Wagner was a fugitive; at no time during the trial was he available to be measured by the government. The fact that his "rap sheet" listed him as five feet two is not conclusive evidence of his height, and thus serves, as did Sharon Wagner's testimony, only as an estimate.

Finally, we agree with the district court that the prosecutor's references in his closing argument to his own nearsightedness and his personal view as to the weight of certain evidence does not require that

_____

[24] Sharon Wagner's testimony at Trial #1 on cross-examination reads as follows:

> Q: How tall is your brother, Anthony?
>
> A: I'm not sure.
>
> Q: Is he about five four?
>
> A: I'm not sure; probably.

J.A. at 204.

the conviction be vacated. To require reversal, remarks made by a prosecutor in his closing argument must not only have been improper, but must have also "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Loayza, 107 F.3d at 262 (quoting United States v. Francisco, 35 F.3d 116, 120 (4th Cir. 1994)). In considering whether such remarks prejudiced the defendant, we consider the following: (1) whether the prosecutor's remarks had a tendency to mislead the jury and prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the weight of the evidence against the accused; and (4) whether the prosecutor's remarks were deliberate. Id. at 262.

Even if appellant is correct that the prosecutor's reference to his own nearsightedness improperly intimated his personal opinion as to the reliability of a witness's identification, we fail to find any resulting prejudice. Far from the "discourse" claimed by appellant, this isolated remark merely reveals an imprudent attempt to counter appellant's efforts to discredit the witness's identification by reference to her myopia. Likewise, we find no prejudice in the prosecutor's comments regarding how he would evaluate the inability of certain witnesses to remember the color of the clothing worn by the robbers. Again, we doubt that such comments were deliberately placed before the jury in an attempt to mislead, especially in light of the prosecutor's subsequent explanation, "And again, ladies and gentlemen, that's your decision. You are the judges of credibility. You heard the testimony." J.A. at 436. Such sentiment was echoed by the court's subsequent instruction that comments made by the lawyers were not evidence in the case and not binding on the jury. Finally, even without these remarks, we believe that the weight of the evidence presented at trial supports appellant's conviction for unarmed bank robbery. As a result, we conclude that the prosecutor's remarks did not materially affect the verdict, and thus reject appellant's claim.

V.

For the aforementioned reasons, appellant's convictions for conspiracy in Trial #1 and for unarmed bank robbery in Trial #2 are affirmed.

AFFIRMED